MDL 1720

**JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

**JUL 2 8 2005**

**FILED
CLERK'S OFFICE**

-------------------------------------------------------x
                       :

**IN RE PAYMENT CARD SURCHARGE**   :
**ANTITRUST LITIGATION**           :      **MDL Docket No.:** _____

                       :

-------------------------------------------------------x

## MOTION FOR TRANSFER AND COORDINATION
## OR CONSOLIDATION UNDER 28 U.S.C. § 1407

Plaintiffs Rookies, Inc. and JASA, Inc. respectfully move this Panel, pursuant to

28 U.S.C. § 1407, for an Order transferring all related antitrust actions challenging the

"No-Surcharge Rule" of the Visa and MasterCard bankcard associations, and any tag-

along actions that may be filed, to the United States District Court for the Northern

District of California for coordination or consolidation.

Movants affirm that:

1.     Movants are the Plaintiffs in the following case: *Rookies, Inc. and JASA,*

*Inc. v. Visa USA, Inc. and MasterCard International, Inc.*, Civil Action No. C 05-2933

BZ, United States District Court for the Northern District of California.

2.     A true and correct copy of the complaint is attached hereto as Exhibit A.

3.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15 and 26, for treble damages and injunctive relief, as well as reasonable

attorneys' fees and costs, with respect to the injuries sustained by Plaintiffs and members

of the Class arising from violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§

1

OFFICIAL FILE COPY

ORIGINAL

1 and 2.

4.     Attached hereto as Exhibit B is a list of all other actions of which Plaintiffs'

counsel are aware that contain substantially similar allegations and seek similar relief (the

"Similar Actions").  As set forth in the accompanying memorandum of law, the Similar

Actions include complaints that challenge the No-Surcharge Rule as a violation of the

antitrust laws, and do not include cases that challenge other practices of defendants Visa

and MasterCard, including cases challenging the so-called interchange system.

5.     Plaintiffs' action and the Similar Actions arise out of identical conduct and

raise identical issues.  In each case, the court will be asked to determine the following

common factual and legal issues:

    (i)     Whether the Associations and their member banks demand from merchants,
as a condition of being permitted to accept defendant's branded payment
cards, that the merchant may not assess a discrete surcharge to the consumer
in the amount of the actual discount fee that the merchant incurs;

    (ii)    Whether Visa's and MasterCard's imposition of the No-Surcharge Rule
serves to entrench their monopoly position in the marketplace;

    (iii)   Whether defendants' imposition of the No-Surcharge Rule forces merchants
and those consumers who make purchases on relatively low-cost payment
media (such as cash or on-line debit cards) to subsidize the perquisites and
benefits enjoyed by users of high-cost payment media, including
defendant's branded credit and debit cards;

    (iv)    Whether the Visa and MasterCard bankcard associations, acting in concert
with and through their member banks, have conspired to maintain the No-
Surcharge Rule in order to achieve and/or preserve their monopoly
positions in the relevant markets.

    (v)     Whether the merchant discount rates that members of the Class have been
forced to pay for Visa and MasterCard credit and debit card transactions

2

exceed the rates that would prevail in the absence of the No-Surcharge Rule;

(vi)    Whether, upon abolition of the No-Surcharge Rule, the Visa and MasterCard associations will use their centralized rate-setting apparatuses to swiftly and efficiently establish competitive prices for credit and debit card services;

(vii)    Whether Plaintiff and other members of the Class are entitled to declaratory, injunctive relief, and/or other equitable relief;

(viii)    Whether the Defendants fraudulently concealed the conspiracy alleged herein; and

(ix)    The appropriate measure of damages sustained by Plaintiff and other members of the Class.

6.    Each of the cases at issue seeks equitable and injunctive relief for the class.

7.    The cases subject to the instant petition are in the very early stages of litigation: no discovery has been conducted. No procedural or substantive rulings have been made in any of these cases, and accordingly, no prejudice or inconvenience would result from transfer, coordination and/or consolidation.

8.    Discovery conducted in Plaintiff's action and the Similar Actions will be substantively the same because the allegations, parties, and witnesses are substantially the same.

9.    Counsel for the Plaintiffs understand and believe that additional actions alleging similar claims and seeking similar relief may be filed in the various district courts in the near future.

10.    No district is better suited for the handling of this litigation than the Northern District of California.

Under these circumstances, transfer and coordination or consolidation of pretrial proceedings in the Movant's action and the Similar Actions will promote the convenience of the parties and witnesses and the just and efficient conduct of these actions.

Respectfully submitted this 26th day of July, 2005.

Respectfully submitted,

**MARKUN ZUSMAN & COMPTON LLP**

David S. Markun (State Bar No. 108067)
Edward S. Zusman, Esq. (State Bar No.154366)
Kevin K. Eng (State Bar No. 209036)
465 California Street, Suite 500
San Francisco, CA 94104
Telephone: (415) 438- 4515
Facsimile: (415) 434-4505

**GREGORY J. HUBACHEK, LLP**
Gregory Hubachek
Louisiana Bar Number 25416
3045 Ridgelake Drive, Suite 203
Metairie, LA 70002
(504) 838-8811

**COUNSEL FOR MOVANT**

(Service List Follows)

4

**TO:**

Hon. J. Owen Forrester
United States District Court
Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street, SW
Atlanta, GA 30303-3361

Clerk of the Court
United States District Court
Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street, SW
Atlanta, GA 30303-3361

Hon. Bernard Zimmerman
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

Hon. Maxine M. Chesney
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

Clerk of the Court
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

**FRIEDMAN & SHUBE**
Gary Friedman (GF 2597)
Noah Shube (NS 1300)
155 Spring Street, 5th Floor
New York, New York 10012
(212) 680-5150

(Continued)

**REINHARDT WENDORF & BLANCHFIELD**
Mark Reinhardt, Esq.
Mark A. Wendorf, Esq.
1250 East First National Bank Building
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

**CHITWOOD & HARLEY**
Craig G. Harley
Georgia Bar No. 326813
2900 Promenade II
1230 Peachtree Street, NE
Atlanta, Georgia 30309
Phone: (404) 873-3900

**CHESTNUT & CAMBRONNE**
Karl Cambronne
3700 Mithun Tower
222 South Ninth Street
Minneapolis MN  55402
(612) 339-3700

**ALSTON & BIRD LLP**
Martin J. Elgison, Esq.
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424 USA
Phone: 404-881-7000

**MASTERCARD INTERNATIONAL**
Noah J. Hanft, Esq.
General Counsel
2000 Purchase Street
Purchase, NY 10577

**VISA USA**
Joshua R. Floum, Esq.
General Counsel
P.O. 8999
San Francisco, CA 94128

6

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 2 8 2005

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

-------------------------------------------------------x
                       :

**IN RE PAYMENT CARD SURCHARGE**   :
**ANTITRUST LITIGATION**                **MDL Docket No.: _____**

                       :

-------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR TRANSFER UNDER 28 U.S.C § 1407

Plaintiffs Rookies, Inc. and JASA, Inc. submit this memorandum of law in support

of their motion, made pursuant to 28 U.S.C. § 1407, for an Order transferring all related

antitrust actions challenging the "No-Surcharge Rule" of the Visa and MasterCard

bankcard associations, and any tag-along actions that may be filed, to the United States

District Court for the Northern District of California for coordination or consolidation.

## BACKGROUND AND INTRODUCTION

Plaintiffs have filed a class action lawsuit in the Northern District of California

alleging that Defendants Visa USA, Inc. and MasterCard International, Inc. have violated

§§ 1 and 2 of the Sherman Act by instituting and maintaining a "No-Surcharge Rule,"

whereby the defendants prohibit merchants from passing along to their customers a

discrete surcharge to account for the fees the defendants charge for processing their

payment transactions. Plaintiffs allege that the No-Surcharge Rule entrenches the

monopoly position of defendants and constitutes an unreasonable vertical price-based

1

ORIGINAL

restraint, and that Visa and MasterCard have conspired to with one another to perpetuate the No-Surcharge Rule and thereby achieve, expand and/or maintain monopoly power. Plaintiffs seek a permanent injunction abolishing the No-Surcharge Rule as well as damages.

In addition to movants' lawsuit and another action filed in the Northern District of California, at least one other similar lawsuits challenging the No-Surcharge Rule have been filed in other federal district courts. One action, filed in the Northern District of Georgia, names only Visa USA as defendant but otherwise contains substantially identical claims. Plaintiffs' counsel further believe it is very likely that additional lawsuits will follow. Because all these lawsuits attacking the No-Surcharge Rule will involve common issues and implicate common defendants, the Panel should transfer the Surcharge cases to one court for consolidation and coordinated proceedings. Under the prevailing jurisprudence of this Panel, the Northern District of California is the most appropriate forum for coordination and centralization of this litigation.

## THE RELATED ACTIONS AND THEIR
## COMMON DEFENDANTS AND CLAIMS.

The following actions (hereinafter, the "Surcharge Cases") involve similar claims,

attacking the bankcard associations' No-Surcharge Rules as violations of the antitrust

laws:

1.  *Rookies, Inc. and JASA, Inc. v. Visa USA, Inc. and MasterCard International, Inc.*, Civil Action No. C 05-2933 BZ, United States District Court for the Northern District of California

2.  *Randall Jasperson d/b/a Jasperson Sod Service v. Visa USA, Inc. and MasterCard International, Inc..*, Civil Action No. C 05-2996 MMC, United States District Court for the Northern District of California

3.  *Animal Land, Inc. v. VISA USA, Inc,* Civil Action No. 1:05-1210- JOF, United States District Court for the Northern District of Georgia, Atlanta Division

Transfer and consolidation of the Surcharge Cases is appropriate and necessary.

The current state of the respective court dockets does not favor any district over the

Northern District of California.  The principal defendant, Visa USA, is based in San

Francisco and Daly City, California; more of the witnesses and documents necessary to the

trial of this action are located in that District than any other; and the courts of that District

have a great deal of expertise with the sorts of issues implicated in this complex antitrust

action.

The Surcharge Cases all raise the following factual and legal issues, rendering

consolidation and/or coordination appropriate:

3

(i)     Whether the Associations and their member banks demand from merchants, as a condition of being permitted to accept defendant's branded payment cards, that the merchant may not assess a discrete surcharge to the consumer in the amount of the actual discount fee that the merchant incurs;

(ii)    Whether Visa's and MasterCard's imposition of the No-Surcharge Rule serves to entrench their monopoly position in the marketplace;

(iii)   Whether defendants' imposition of the No-Surcharge Rule forces merchants and those consumers who make purchases on relatively low-cost payment media (such as cash or on-line debit cards) to subsidize the perquisites and benefits enjoyed by users of high-cost payment media, including defendant's branded credit and debit cards;

(iv)    Whether the Visa and MasterCard bankcard associations, acting in concert with and through their member banks, have conspired to maintain the No-Surcharge Rule in order to achieve and/or preserve their monopoly positions in the relevant markets.

(v)     Whether the merchant discount rates that members of the Class have been forced to pay for Visa and MasterCard credit and debit card transactions exceed the rates that would prevail in the absence of the No-Surcharge Rule; and

(vi)    Whether, upon abolition of the No-Surcharge Rule, the Visa and MasterCard associations will use their centralized rate-setting apparatuses to swiftly and efficiently establish competitive prices for credit and debit card services.


## ARGUMENT

## I.      CONSOLIDATION OF ALL THE SURCHARGE CASES IN A SINGLE DISTRICT IS APPROPRIATE

Transfer of all the pending Surcharge Cases to a single district for consolidated or coordinated pretrial proceedings clearly serves the core purposes of 28 U.S.C. § 1407.

The Panel identified those core purposes in *In re Amino Acid Lysine Antitrust Litig.*, 910 F.

4

Supp. 696, 699 (J.P.M.D.L. 1995): "Centralization under Section 1407 is . . . necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to class certifications), and conserve the resources of the parties, their counsel and the judiciary."

There is no question that discovery in the pending Surcharge Cases will be duplicative. To have this duplicative discovery proceeding in different district courts located hundreds of miles apart would be wasteful, inefficient, and would place a totally unfair burden on the judicial system. In addition, as the Panel has noted, "Section 1407 centralization is especially important to ensure consistent treatment of class action issues." *In re Hawaiian Hotelroom Rate Antitrust Litigation*, 438 F. Supp. 935, 936 (J.P.M.D.L. 1977); *In re Amino Acid Lysine Antitrust Litig.*, 910 F. Supp. at 699.

In view of the foregoing, Plaintiffs submit that the coordination or consolidation of the Surcharge Cases before a single district judge would serve the purposes of efficient administration of these cases, prevent duplicative discovery, avoid the possibility of conflicting pretrial rulings, and generally streamline all other pretrial proceedings as well. *See In re Capital Underwriters, Inc. Securities Litig.*, 464 F. Supp. 955, 959-60 (J.P.M.D.L. 1979).

## II.   THE "SURCHARGE" MDL PROCEEDING SHOULD INCLUDE *ONLY* CASES ATTACKING THE NO-SURCHARGE RULE

Quite separate and apart from the Surcharge Cases, there are currently pending in various courts certain other challenges to other practices of Visa, MasterCard and some 20 bank members of the bankcard associations.  The instant Motion does <u>not</u> seek to include these cases, which are briefly described below; indeed, movants submit that it would be manifestly inappropriate under § 1407 to consolidate those actions with the Surcharge Cases.

### A.   <u>Cases Not Covered By The Instant Motion</u>

To the knowledge of movants, there are at least three categories of cases pending against defendants that are beyond the scope of this Motion, and that should not be consolidated with the Surcharge Cases:

(1)   The instant Motion excludes actions challenging the practices of Visa and MasterCard in prohibiting member banks from issuing credit or debit cards under the brand logo of competitor networks.  *Discover Financial Services, Inc. v. Visa U.S.A. Inc., et al.*, 04-CV-7844 (BSJ) (S.D.N.Y.); *American Express Travel Related Services Company, Inc. v. Visa U.S.A. Inc., et al.*, Case No. 04-CV-08967 (BSJ) (S.D.N.Y.); and *In re Visa/MasterCard Membership Rules Antitrust Litigation*, No. 01-CV-10027 (BSJ) (S.D.N.Y.).  The factual issues raised in these cases, asserted by competitors and merchants, are dissimilar from the Surcharge Cases and, while there may be some overlap in the damages sought as between these cases and the Surcharge Cases, the federal courts

6

are well equipped to deal with any claim of set-off or double recovery that may later arise.

(2)     The instant Motion excludes actions challenging the Honor All Cards rules of Visa and MasterCard, including actions from merchants who have opted out of the class in *In Re Visa Check/Mastermoney Antitrust Litigation (Wal-Mart Stores, Inc. v. Visa USA, Inc.)* Master File No. CV-96-5238 (Gleeson, J.) (E.D.N.Y.).   Here again, the issues raised are distinct and, while claims of overlapping damages are at least possible, the district courts will be able to protect defendants fully against double recovery.

(3)     The Motion likewise excludes actions challenging the internal method by which the defendant associations set their "interchange rates," meaning the amount that the merchant's bank must remit to the cardholder's bank.  Numerous cases have been filed attacking the establishment of these interchange rates as illegal horizontal price fixing, including, to movants' knowledge: *Kendall et. al v. Visa U.S.A., Inc.,* No. C 04-4276 JSW (N.D. Cal.), *Photos Etc. Corp., et al.  v. Visa U.S.A. Inc., et al.,* No. 305-CV-1007 (RNC) (D. Conn.); *Kroger Co. et al. v. Visa U.S.A. Inc., et al.,* 05 CV 6409 (S.D.N.Y.); *NuCity Publications, Inc. v. Visa U.S.A. Inc., et al.,* 05-CV-5991 (S.D.N.Y.); and at least three other cases that appear to be in the mold of those cases (the "Interchange Cases").

The Interchange Cases raise factual and legal issues that are distinct from the Surcharge Cases.  The Interchange Cases seek to abolish the "interchange" system whereby banks set intra-association, bank-to-bank fees. The Surcharge Cases seek, for U.S. retailers, the right to impose upon the cardholder the cost of processing payment

7

transactions on his chosen card.  Further, while the Surcharge Cases raise the substantive

factual and legal issues identified above, the Interchange Cases raise *none* of those issues.

Moreover, plaintiffs in the Surcharge Cases specifically allege that the interchange

system will serve as a *pro-competitive* facilitator of true competition once the No-

Surcharge Rule is abolished.  *See Rookies, Inc.* Complaint at ¶ 30 (upon abolition of the

No-Surcharge Rule, "the Visa, MasterCard and American Express networks would

significantly and swiftly reduce their centrally set interchange rates, as payment card

networks compete to offer lower discount rates and retain cardholders."); *see also id.,* ¶ 25

("Because of the interchange system, each Association will be able to respond efficiently

to the introduction of price-based competition in the market for payment card services,

upon abolition of the NSR"); *supra* p.4, item no. (vi).

By stark contrast, the Interchange Cases seek abolition of the Interchange system.

Under these circumstances, consolidation is clearly inappropriate.  Indeed, on these critical

issues at least, it would be improper for class counsel on the Surcharge Cases to share

work product with class counsel on the Interchange Cases, and vice versa.  Much less

should they be required to proceed in a consolidated action.

**B.     It Is Appropriate To Handle The Surcharge Cases As A Separate MDL Proceeding.**

Movants respectfully submit that the proper approach in this case is to consolidate all of the Surcharge Cases into a single multidistrict litigation.  Whether the Interchange Cases are likewise subsequently consolidated in a separate multidistrict litigation -- as they no doubt will be -- is a separate issue.  The transferee courts are fully capable of coordinating with one another in the event that coordination proves necessary (which appears doubtful), and of issuing such rulings as may be necessary to avoid multiple recovery.  *See, e.g., Amino Acid Lysine Antitrust Litig.*, 910 F. Supp. at 699 (declining to consolidate and transfer all cases relating to price fixing of lysine, corn syrup and citric acid and, instead, consolidating and transferring separately all lysine cases, all corn syrup cases and all citric acid cases, notwithstanding overlap of defendants and certain issues).

**III.    THE CASES SHOULD BE CONSOLIDATED IN THE NORTHERN DISTRICT OF CALIFORNIA, WHICH IS SUITED TO HANDLE THIS LITIGATION EFFICIENTLY.**

No district is as well suited to hear the Surcharge Cases as the Northern District of California, the home district of the principal defendant, Visa U.S.A. Inc.  Visa witnesses and documents are located in the San Francisco area.  San Francisco has direct flights from all major cities and is easily accessible for all counsel and expert witnesses.  Further, the judges in the Northern District of California have great experience with complex antitrust issues and class action practice in general, and with the payments industry in particular.  In

9

addition, because there has been no discovery yet commenced in any of the Surcharge

Cases, there is no material disparity in the progress of any of the actions, and the focus of

the Panel's analysis should be the capacity of the proposed transferee court. In this case,

according to the 2004 Federal Court Management Statistics, the Northern District of

California placed 24th of all district courts in terms of the median time between filing and

disposition of civil cases. By contrast, the Eastern District of New York (home to the Visa

Check litigation) placed 76th, while the Northern District of Georgia (where the Animal

Land case was filed) placed 38th. See http://www.uscourts.gov/cgi-bin/cmsd2004.

## CONCLUSION

For the reasons set forth herein, movant respectfully requests that all of the

Surcharge Cases be transferred to the Northern District of California.

Respectfully submitted this 26th day of July, 2005.

MARKUN ZUSMAN & COMPTON LLP

David S. Markun (State Bar No. 108067)
Edward S. Zusman, Esq. (State Bar No.154366)
Kevin K. Eng (State Bar No. 209036)
465 California Street, Suite 500
San Francisco, CA  94104
Telephone: (415) 438- 4515
Facsimile: (415) 434-4505

**COUNSEL FOR MOVANT**

(Counsel list continued)

10

**GREGORY J. HUBACHEK, LLP**
Gregory Hubachek
Louisiana Bar Number 25416
3045 Ridgelake Drive, Suite 203
Metairie, LA 70002
(504) 838-8811

**COUNSEL FOR MOVANT**

**TO:**

Hon. J. Owen Forrester
United States District Court
Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street, SW
Atlanta, GA 30303-3361

Clerk of the Court
United States District Court
Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street, SW
Atlanta, GA 30303-3361

Hon. Maxine M. Chesney
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

Clerk of the Court
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

(Continued)

11

**FRIEDMAN & SHUBE**
Gary Friedman (GF 2597)
Noah Shube (NS 1300)
155 Spring Street, 5th Floor
New York, New York 10012
(212) 680-5150

**REINHARDT WENDORF & BLANCHFIELD**
Mark Reinhardt, Esq.
Mark A. Wendorf, Esq.
1250 East First National Bank Building
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

**CHITWOOD & HARLEY**
Craig G. Harley
Georgia Bar No. 326813
2900 Promenade II
1230 Peachtree Street, NE
Atlanta, Georgia 30309
Phone: (404) 873-3900

**CHESTNUT & CAMBRONNE**
Karl Cambronne
3700 Mithun Tower
222 South Ninth Street
Minneapolis MN  55402
(612) 339-3700

**ALSTON & BIRD LLP**
Martin J. Elgison, Esq.
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424 USA
Phone: 404-881-7000

**ARNOLD & PORTER**
Julie Rotenberg, Esq.
555 Twelfth Street, NW
Washington, DC 20004-1206
202.942.5000

(Continued)

12

**MASTERCARD INTERNATIONAL**
Noah J. Hanft, Esq.
General Counsel
2000 Purchase Street
Purchase, NY 10577

**VISA USA**
Joshua R. Floum, Esq.
General Counsel
P.O. 8999
San Francisco, CA 94128

13

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

JUL 2 8 2005

FILED
CLERK'S OFFICE.

-----------------------------------------------------------x
        :

IN RE PAYMENT CARD SURCHARGE    :
ANTITRUST LITIGATION         :   MDL Docket No.: _____
        :

-----------------------------------------------------------x

**COMPENDIUM OF COMPLAINTS FILED**

| Ex. | Case Name | File No. | Date Filed |
|-----|-----------|----------|------------|
| A. | *Rookies, Inc. and JASA, Inc. v. Visa USA, Inc. and MasterCard Int'l* | C 05-2933 BZ | July 21, 2005 |
| B. | *Randall Jasperson d/b/a Jasperson Sod Service v. Visa USA, Inc. and MasterCard Int'l* | C 05-2966 MMC | July 25, 2005 |
| C. | *Animal Land, Inc. v. VISA USA, Inc.* | 1:05-CV-1210-JOF | May 6, 2005 |

Respectfully submitted this 26th day of July, 2005

        **MARKUN ZUSMAN & COMPTON LLP**

        David S. Markun (State Bar No. 108067)
        Edward S. Zusman, Esq. (State Bar No.154366)
        Kevin K. Eng (State Bar No. 209036)
        465 California Street, Suite 500
        San Francisco, CA  94104
        Telephone: (415) 438- 4515
        Facsimile: (415) 434-4505

        **COUNSEL FOR MOVANT**

        (Counsel List Continued)

ORIGINAL

**GREGORY J. HUBACHEK, LLP**
Gregory Hubachek
Louisiana Bar Number 25416
3045 Ridgelake Drive, Suite 203
Metairie, LA 70002
(504) 838-8811

**COUNSEL FOR MOVANT**


**TO:**

Hon. J. Owen Forrester
United States District Court
Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street, SW
Atlanta, GA 30303-3361

Clerk of the Court
United States District Court
Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street, SW
Atlanta, GA 30303-3361

Hon. Bernard Zimmerman
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

Hon. Maxine M. Chesney
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

Clerk of the Court
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

(Continued)

**FRIEDMAN & SHUBE**
Gary Friedman (GF 2597)
Noah Shube (NS 1300)
155 Spring Street, 5th Floor
New York, New York 10012
(212) 680-5150

**REINHARDT WENDORF & BLANCHFIELD**
Mark Reinhardt, Esq.
Mark A. Wendorf, Esq.
1250 East First National Bank Building
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

**CHITWOOD & HARLEY**
Craig G. Harley
Georgia Bar No. 326813
2900 Promenade II
1230 Peachtree Street, NE
Atlanta, Georgia 30309
Phone: (404) 873-3900

**CHESTNUT & CAMBRONNE**
Karl Cambronne
3700 Mithun Tower
222 South Ninth Street
Minneapolis MN  55402
(612) 339-3700

**ALSTON & BIRD LLP**
Martin J. Elgison, Esq.
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424 USA
Phone: 404-881-7000

**MASTERCARD INTERNATIONAL**
Noah J. Hanft, Esq.
General Counsel
2000 Purchase Street
Purchase, NY 10577

(Continued)

**VISA USA**
Joshua R. Floum, Esq.
General Counsel
P.O. 8999
San Francisco, CA 94128

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 2 8 2005

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

------------------------------------------------------x
                       :

**IN RE PAYMENT CARD SURCHARGE**  :
**ANTITRUST LITIGATION**        :  **MDL Docket No.:** _____
                       :

------------------------------------------------------x

## SEPARATE SCHEDULE OF ACTIONS
## REQUESTED TO BE TRANSFERRED

1.    *Rookies, Inc. and JASA, Inc. v. Visa USA, Inc. and MasterCard International, Inc..*, Civil Action No. C 05-2933 BZ, United States District Court for the Northern District of California

2.    *Randall Jasperson d/b/a Jasperson Sod Service v. Visa USA, Inc. and MasterCard International, Inc.,* Civil Action No. C 05-2996 MMC, United States District Court for the Northern District of California

3.    *Animal Land, Inc. v. VISA USA, Inc,* Civil Action No. 1:05-1210- JOF, United States District Court for the Northern District of Georgia, Atlanta Division

Respectfully submitted this 26th day of July, 2005.

**MARKUN ZUSMAN & COMPTON LLP**

_____
David S. Markun (State Bar No. 108067)
Edward S. Zusman, Esq. (State Bar No.154366)
Kevin K. Eng (State Bar No. 209036)
465 California Street, Suite 500
San Francisco, CA  94104
Telephone: (415) 438- 4515
Facsimile: (415) 434-4505

**COUNSEL FOR MOVANT**

ORIGINAL

(Counsel list continued)
**GREGORY J. HUBACHEK, LLP**
Gregory Hubachek
Louisiana Bar Number 25416
3045 Ridgelake Drive, Suite 203
Metairie, LA 70002
(504) 838-8811

**COUNSEL FOR MOVANT**

**TO:**

Hon. J. Owen Forrester
United States District Court
Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street, SW
Atlanta, GA 30303-3361

Clerk of the Court
United States District Court
Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street, SW
Atlanta, GA 30303-3361

Hon. Bernard Zimmerman
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

Hon. Maxine M. Chesney
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

(Continued)

2

Clerk of the Court
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

**FRIEDMAN & SHUBE**
Gary Friedman (GF 2597)
Noah Shube (NS 1300)
155 Spring Street, 5th Floor
New York, New York 10012
(212) 680-5150

**REINHARDT WENDORF & BLANCHFIELD**
Mark Reinhardt, Esq.
Mark A. Wendorf, Esq.
1250 East First National Bank Building
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

**CHITWOOD & HARLEY**
Craig G. Harley
Georgia Bar No. 326813
2900 Promenade II
1230 Peachtree Street, NE
Atlanta, Georgia 30309
Phone: (404) 873-3900

**CHESTNUT & CAMBRONNE**
Karl Cambronne
3700 Mithun Tower
222 South Ninth Street
Minneapolis MN  55402
(612) 339-3700

**ALSTON & BIRD LLP**
Martin J. Elgison, Esq.
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424 USA
Phone: 404-881-7000

3

(Continued)

**MASTERCARD INTERNATIONAL**
Noah J. Hanft, Esq.
General Counsel
2000 Purchase Street
Purchase, NY 10577

**VISA USA**
Joshua R. Floum, Esq.
General Counsel
P.O. 8999
San Francisco, CA 94128

4

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 28 2005

FILED
CLERK'S OFFICE

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-x

IN RE PAYMENT CARD SURCHARGE
ANTITRUST LITIGATION

:
:
:
:
:

MDL Docket No.: _____

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-x

## REVISED CERTIFICATE OF SERVICE

I am employed in the County of San Francisco, State of California, over the age of eighteen years, and not a party to this action. My business address is Markun Zusman & Compton LLP, 465 California Street, Suite 500, San Francisco, CA, 94104. On July 26, 2005, I served the within document(s):

**MOTION FOR TRANSFER AND COORDINATION
OR CONSOLIDATION UNDER 28 U.S.C. § 1407**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR TRANSFER UNDER 28 U.S.C § 1407**

**SEPARATE SCHEDULE OF ACTIONS
REQUESTED TO BE TRANSFERRED**

**COMPENDIUM OF COMPLAINTS FILED**

in this action, by placing a true copy thereof enclosed in a sealed envelope as follows:

☒    (By Federal Express)  I served the above document(s) on the parties listed below by placing true copies thereof in sealed envelopes, addressed as shown, for collection and delivery by Federal Express.

See Attached Service List

1

I declare under penalty of perjury under the laws of the United States and the State of California that the above is true and correct.  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 26, 2005, at San Francisco, California.

Robert M. Rodriguez

# SERVICE LIST

Hon. J. Owen Forrester
United States District Court
Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street, SW
Atlanta, GA 30303-3361

Clerk of the Court
United States District Court
Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street, SW
Atlanta, GA 30303-3361

Hon. Bernard Zimmerman
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

Hon. Maxine M. Chesney
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

Clerk of the Court
United States District Court
Northern District California
450 Golden Gate Ave.
San Francisco, CA 94102

## FRIEDMAN & SHUBE
Gary Friedman (GF 2597)
Noah Shube (NS 1300)
155 Spring Street, 5th Floor
New York, New York 10012
(212) 680-5150
Counsel for Plaintiff Animal Land, Inc.
*(Animal Land, Inc. v. VISA USA, Inc, Civil Action No. 1:05-CV-1210-JOF, United States District Court for the Northern District of Georgia, Atlanta Division)*

**REINHARDT WENDORF & BLANCHFIELD**
Mark Reinhardt, Esq.
Mark A. Wendorf, Esq.
1250 East First National Bank Building
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100
Counsel for Plaintiff Animal Land, Inc.
*(Animal Land, Inc. v. VISA USA, Inc, Civil Action No. 1:05-CV-1210-JOF, United States
District Court for the Northern District of Georgia, Atlanta Division)*

**CHITWOOD & HARLEY**
Craig G. Harley
Georgia Bar No. 326813
2900 Promenade II
1230 Peachtree Street, NE
Atlanta, Georgia 30309
Phone: (404) 873-3900
Counsel for Plaintiff Animal Land, Inc.
*(Animal Land, Inc. v. VISA USA, Inc, Civil Action No. 1:05-CV-1210-JOF, United States
District Court for the Northern District of Georgia, Atlanta Division)*

**CHESTNUT & CAMBRONNE**
Karl Cambronne
3700 Mithun Tower
222 South Ninth Street
Minneapolis MN  55402
(612) 339-3700
Counsel for Plaintiff Randall Jasperson
*(Randall Jasperson d/b/a Jasperson Sod Service v. Visa USA, Inc. and
MasterCard International, Inc.,* Civil Action No. 1:05-CV-1210-JOF, United
States)

**ALSTON & BIRD LLP**
Martin J. Elgison, Esq.
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424 USA
Phone: 404-881-7000
Counsel for Defendant Visa USA
*(Animal Land, Inc. v. VISA USA, Inc, Civil Action No. 1:05-CV-1210-JOF, United States
District Court for the Northern District of Georgia, Atlanta Division)*

**ARNOLD & PORTER**
Julie Rotenberg, Esq.
555 Twelfth Street, NW
Washington, DC 20004-1206
202.942.5000
Counsel for Defendant Visa USA
*(Animal Land, Inc. v. VISA USA, Inc, Civil Action No. 1:05-CV-1210-JOF, United States District Court for the Northern District of Georgia, Atlanta Division; Rookies, Inc. and JASA, Inc. v. Visa USA, Inc. and MasterCard Int'l, Case No. C 05-2933 BZ, United States District Court for the Northern District of California; Randall Jasperson d/b/a Jasperson Sod Service v. Visa USA, Inc. and MasterCard Int'l, Case No. C 05-2966 MMC, United States District Court for the Northern District of California)*

**MASTERCARD INTERNATIONAL**
Noah J. Hanft, Esq.
General Counsel
2000 Purchase Street
Purchase, NY 10577

**VISA USA**
Joshua R. Floum, Esq.
General Counsel
P.O. 8999
San Francisco, CA 94128

# Exhibit A

1  David S. Markun (CA State Bar No. 108067)
    Edward S. Zusman (CA State Bar No. 154366)
2  Kevin K. Eng (CA State Bar No. 209036)
    MARKUN ZUSMAN & COMPTON, LLP
3  465 California Street, Suite 500
    San Francisco, CA 94104
4  Telephone: (415) 438-4515
    Facsimile: (415) 434-4505
5
    Gregory J. Hubachek
6  Gregory J. Hubachek, LLC
    3045 Ridgelake Drive, Suite 203
7  Metairie, Louisiana 70002

8
    Attorneys for Plaintiffs
9

*E-Filing*

10

11            UNITED STATES DISTRICT COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13

14  ROOKIES, INC. and JASA, INC., on behalf of  Case No.
    themselves and all others similarly situated,
15                     COMPLAINT
             Plaintiffs,
16                     CLASS ACTION
    v.
17                     DEMAND FOR JURY TRIAL
    VISA U.S.A., INC. and MASTERCARD
18  INTERNATIONAL, INC.,

19             Defendants.

20

21

22      Plaintiffs Rookies, Inc. and Jasa, Inc., on behalf of themselves and all others similarly

23  situated, allege for their complaint against Visa USA, Inc. ("Visa") and MasterCard International,

24  Inc. ("MasterCard"), upon knowledge with respect to their own acts and upon information and

    belief with respect to all other matters, as follows:
25

26  ///

27  ///

28  ///

                               1

## I.

## INTRODUCTION

1.     This antitrust class action, asserted on behalf of merchants that accept Visa-branded and MasterCard-branded payment cards, challenges the rules of the Visa and MasterCard associations (together, the "Associations") forbidding merchants from passing along to cardholders a discrete surcharge to account for the fees that the merchant is forced to pay defendant and its member banks in connection with transactions effected on defendants' payment cards (the "No-Surcharge Rule" or "NSR").

2.     As set forth below, the No-Surcharge Rule is anticompetitive.  It raises the prices of goods and services for all consumers because merchants, seeking to pass along the costs they incur to process payment transactions on the Associations' network, are forced to increase the prices of goods and services to all of their customers.  Under the NSR, merchants are prohibited from assessing the costs of Visa and MasterCard transactions directly upon those consumers who elect to use Visa or MasterCard payment cards.  The No-Surcharge Rule thus forces merchants -- and their customers who pay with cash or low cost plastic payment media -- to subsidize all of the benefits received by Visa and MasterCard cardholders, including frequent flier miles, cash-back rewards and other costly perquisites.

3.     The No-Surcharge Rule also insulates the defendants from any efficiency-based competitive threat.  In the absence of the No-Surcharge Rule, plaintiffs and merchants based in some 41 other states would be free to impose a surcharge on plastic payment cards in the amount of the so-called "discount fees" paid to Visa and the other payment networks.  In the face of such surcharges, consumers would be free to (and would) migrate away from "expensive" payment media, such as Visa, MasterCard or American Express, and towards less expensive payment cards -- i.e., cards that carry lower "discount fees," and hence lower surcharges.  In other words, if merchants were free to impose a surcharge, a network offering payment processing services to merchants at a lower fee would be able to gain market share by attracting cardholders as well as merchants. The No-Surcharge Rule, however, flatly ensures that defendants' monopoly power will never be challenged by a competitor's ability to deliver payment card processing services at a

2

1  lower cost. The NSR, then, is the ultimate monopoly maintenance device.

2       4.     Finally, in the face of all of these anticompetitive effects -- including (a) inflating

3  the cost of retail goods and services, (b) compelling users of low-cost payment media to subsidize

4  the frequent flier miles and other perquisites enjoyed by users of high-cost payment media, and

5  (c) the flat-out permanent entrenchment of defendant's monopoly position against any efficiency-

6  based threat -- there is simply no procompetitive justification whatsoever for the No-Surcharge

7  Rule.

8       5.     For all of these reasons, the No-Surcharge Rule constitutes an unlawful monopoly

9  maintenance device, in violation of the Sherman Act § 2, and an unreasonable contract in restraint

10  of trade, in violation of the Sherman Act § 1.

11  **II.**

12  **JURISDICTION AND VENUE**

13       6.     Pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to

14  prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. In

15  addition, Plaintiffs seek damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

16       7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22

17  and 26, because the Associations may be found or transact business within this District. Among

18  other things, Visa, MasterCard and their respective member banks market the Associations'

19  payment card processing services to thousands of merchants within this District, and defendant

20  Visa is headquartered in this District.

21  **III.**

22  **INTRADISTRICT ASSIGNMENT**

23       8.     Assignment to the San Francisco Division of this District is proper pursuant to

24  Civil Local Rule 3-2 because a substantial part of the events or omissions which give rise to this

25  action occurred, and are occurring, in the county of San Francisco.

26  ///

27  ///

28  ///

3

## IV.

## THE PARTIES

9.     Plaintiff Rookies, Inc. is a corporation organized under the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana.

10.     Plaintiff Jasa, Inc. is a corporation organized under the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana.

11.     Defendant Visa is a Delaware corporation.  At all relevant times, Visa was a national bankcard association whose members included more than 6,000 banks.  Visa's principal place of business is San Francisco, California.  Visa transacts business within this District.

12.     Defendant MasterCard is a Delaware corporation.  At all relevant times, MasterCard was a national bankcard association whose members included more than 6,000 banks.  MasterCard's principal place of business is Purchase, New York.

## V.

## CLASS ACTION ALLEGATIONS

13.     Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(b)(2) to restrain an unlawful practice under Sections 1 and 2 of the Sherman Act, and as a damages class action under Rule 23(b)(3).

14.     The class is comprised of all merchants that have accepted Visa and/or Mastercard-branded payment cards during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") throughout the United States (the "Class").  The Class does not include Visa, Mastercard, and their member banks, their subsidiaries or affiliates.

15.     The members of the Class are so numerous that joinder of all members is impracticable.  There exist no conflicts of interest as between the named plaintiffs and the other Class members.  The named plaintiffs have retained counsel that is competent and experienced in federal antitrust and class action litigation.  Plaintiffs and their counsel will fairly and adequately represent the interests of the Class.

///

///

4

16.   In relevant respect, defendants have acted and continue to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate.

17.   This class action is superior to any other method for the fair and efficient adjudication of this dispute.  There will be no extraordinary difficulty in the management of this class action.

18.   Throughout the Statutory Period, the Associations have uniformly imposed the No-Surcharge Rule upon all Class members.  All Class members have been damaged in precisely the same fashion, by precisely the same conduct.  The degree of damages suffered by individual Class members is readily calculable according to an ascertainable formula.  For all of these reasons, questions of law and fact will predominantly be common to the Class.  Among the questions of law and fact common to the Class are:

(i)   Whether the Associations and their member banks demand from merchants, as a condition of being permitted to accept defendant's branded payment cards, that the merchant may not assess a discrete surcharge to the consumer in the amount of the actual discount fee that the merchant incurs;

(ii)   Whether Visa's and MasterCard's imposition of the No-Surcharge Rule serves to entrench their monopoly position in the marketplace;

(iii)   Whether defendants' imposition of the No-Surcharge Rule forces merchants and those consumers who make purchases on relatively low-cost payment media (such as cash or on-line debit cards) to subsidize the perquisites and benefits enjoyed by users of high-cost payment media, including defendant's branded credit and debit cards; and

(iv)   Whether the merchant discount rates that members of the Class have been forced to pay for Visa and MasterCard credit and debit card transactions exceed the rates that would prevail in the absence of the No-Surcharge Rule.

///

///

5

# VI.

## FACTUAL BACKGROUND

19.     Visa and MasterCard are associations comprised of member banks. One function of the member banks is to issue credit and debit cards to their customers bearing the Visa or MasterCard logo. In this capacity, they are known as "issuer banks." Another function of the banks is to acquire and service merchant accounts for the Visa and MasterCard networks; in this capacity, they are referred to as "acquirer banks."

20.     The acquirer banks contract with merchants using form agreements approved by the Associations. These agreements contain terms that are mandated by the Associations. One such term, mandated by both Associations, is the No-Surcharge Rule. A typical iteration of the NSR directs that the merchant: "shall not impose any surcharge or fee for accepting a [Visa-branded] Card" and further provides that the merchant "shall not establish procedures that discourage, favor or discriminate against the use of any particular [Visa- branded] Card."

21.     On behalf of Visa or MasterCard, the acquirer banks charge merchants "discount fees" in connection with processing transactions on the Associations' payment networks. The vast bulk of those discount fees -- typically more than 80% -- are comprised of the "interchange fee," which refers to the fees collected by the issuing bank. The remainder of the merchant discount fee is paid to the acquirer bank and to the association itself. The level of interchange fees is centrally set by each Association.

22.     The discount fees charged to merchants for transactions effected on various payment card products vary widely. Depending on variables such as industry and annual charge volume, a schedule of the discount fees facing a small merchant might – just for the sake of illustration -- include the following:

| | | |
|---|---|---|
| Visa credit: | 2.50 | % |
| MC credit: | 2.50 | % |
| Visa signature debit: | 1.80 | % |
| MC signature debit: | 1.80 | % |
| Discover Card: | 1.60 | % |

6

| American Express: | 3.00 | % |
| PIN-based debit: | 0.25 | % |

23.    On the foregoing example, then, the small merchant will receive $99.75 when a $100 retail transaction is processed on a PIN-based debit card.  By contrast, where that same $100 transaction is processed on a Visa or MasterCard credit card, the merchant in this example will receive only $97.50.

24.    The No-Surcharge Rule ensures that both PIN-based debit card users and Visa and MasterCard credit card users will pay the same amount at the point of sale, no matter how much the merchant stands to receive.  It ensures that the consumer is indifferent to, and ignorant of, the cost of the payment card she has decided to pull out of her wallet.  She does not care if the cost to the merchant of processing the transaction on that card is $2.50 or twenty-five cents.

25.    In the absence of the No-Surcharge Rule, by contrast, consumers would have information concerning the cost of each payment medium, and an incentive to switch from more expensive to less expensive payment media.  Faced with a schedule of surcharges similar to the above table, consumers will migrate away from expensive payment options, such as defendants' credit cards or American Express payment cards.  The result will be competition, in which each Association will be forced to reduce the centrally set price of its services to merchants or lose market share to more efficient rivals.  Because of the interchange system, each Association will be able to respond efficiently to the introduction of price-based competition in the market for payment card services, upon abolition of the NSR.

**Anticompetitive Effects of the NSR:**
**Inflation, Forced Subsidies and Monopoly Maintenance**

26.    By preventing the merchant from passing its payment card services costs along narrowly, via a discrete surcharge to those customers who actually use the payment service, the NSR has a profound inflationary effect on retail goods and services.  It is a matter of fundamental economics that merchants pass along to consumers at least some portion of their payment processing costs.  The No-Surcharge Rule ensures that, in order to pay for the defendants'

7

1    payment processing services, merchants must raise prices to all consumers, including cash-payers

2    and those who would otherwise seek to avoid the high cost of credit card processing services. But

3    for the NSR, then, consumer prices would be lower: the price of goods and services would fall,

4    because those prices would no longer be marked up to reflect merchant discount fees.

5        27.    By the same token, the No-Surcharge Rule effectively mandates that consumers

6    paying by cash, check and low-cost plastic payment media (such as PIN-based debit) must

7    subsidize the costly goods and services enjoyed by Visa or MasterCard credit card users,

8    including such perquisites as frequent flier miles, rental car insurance, free gifts, fraud protection

9    and even cash rewards. These costly perquisites are financed by merchant discount fees. The

10   NSR thus ensures that the cost of these benefits will not be internalized by the cardholders who

11   enjoy them. Instead, the NSR ensures that these costly benefits must be financed by merchants

12   and -- to the extent merchants pass along their payment services costs via general price increases -

13   - by all of their customers, including users of low-cost payment media.

14       28.    The forced subsidization of high-cost payment media users creates a vicious circle

15   for merchants and their customers. The more cardholders use high-cost payment media such as

16   Visa or MasterCard credit cards, the more merchants are required to pay in discount fees. The

17   Associations use these fees to finance benefits with which they entice yet more cardholders into

18   their network. This causes the merchant to incur even more of the high discount fees associated

19   with Visa and MasterCard payment cards. And the more merchants are required to pay in

20   discount fees, the more they must raise prices for all consumers. The merchants are not the only

21   big losers in this equation. Consumers paying by cash, check, food stamps, on-line debit card and

22   other relatively lower cost payment media are significantly injured as well.

23       29.    If the merchant were free to pass along the discount fee directly to the card user

24   via a discrete surcharge, the forced subsidy would disappear. The users of high cost payment

25   cards would themselves fund whatever benefits and conveniences they receive from the payment

26   cards they elect to use. Customers who choose to use an expensive payment medium would pay

27   for the privilege. While an affluent shopper who is 200 points shy of a free trip to Hawaii may

28

8

1   not balk at an extra two dollars on her check-out ticket, the cash-payer and on-line debit user will

2   be relieved of the obligation to subsidize that particular junket.

3       30.     But for the NSR, moreover, the discount fees confronting the merchant would

4   themselves be far lower.  Faced with the prospect of a $2.50 surcharge for using a Visa credit

5   card, many consumers would shift to cheaper payment media, such as Discover Card (around

6   $1.50 for this $100 ticket) or offline debit (around $1) or online PIN -based debit-cards

7   (approximately 25 cents).  Inevitably, the Visa, MasterCard and American Express networks

8   would significantly and swiftly reduce their centrally set interchange rates, as payment card

9   networks compete to offer lower discount rates and retain cardholders.

10      31.     The NSR serves to entrench the Associations' monopoly position.  Indeed, it

11  safeguards the defendants' market dominance against any threat from a competitor who might

12  seek to gain market share by offering credit or debit card payment processing services to

13  merchants at a cheaper price.  The NSR mandates that the consumer's determination of which

14  network is used for any particular transaction will not be affected by the costliness or inefficiency

15  of the network services.  It is the consumer who chooses upon what network her retail transaction

16  will be processed.  But in making this choice, she neither knows nor has reason to care that the

17  defendants' fees may be several times that of a competitive payment mechanism.  Accordingly, if

18  tomorrow a new card network were to offer every merchant in the US credit card services for

19  free, that network would gain no market share from the monopolist Associations because the NSR

20  ensures the consumer will have no incentive to use the cheaper network.  Indeed, the NSR

21  ensures perversely that consumers will prefer the more costly network, which will shower them

22  with frequent flier miles and other benefits.

23      32.     The NSR thus guarantees Visa that its monopoly position -- and MasterCard that

24  its shared monopoly position -- will not be threatened by a rival who has developed a way to

25  deliver credit and debit card services more efficiently.  It ensures that the dominant networks are

26  insulated from efficiency-based competition and are free to extract massive monopoly rents

27  through supra-competitive (indeed, non-competitive) merchant discount fees.

28  ///

9

33.     All of these anticompetitive effects of the NSR are heightened by the fact that technology now exists to tack the "true" surcharge -- representing the merchant's actual discount fee for the transaction at issue -- onto the check-out ticket at the point of sale automatically, through a swipe of the payment card.  Technological innovation in the development of more efficient payment systems is thus also being retarded by the defendant's continued maintenance of the NSR.

34.     If U.S. merchants were free to use at the point of sale a card swiper programmed to tack onto the check-out ticket a surcharge reflecting the discount fee imposed by the payment network for the transaction at issue, enough merchants would do so (or credibly threaten to do so) that the discount fees charged to all merchants would drop down to a level no higher than the rate currently charged for such services by the lowest cost comparable provider of such services.

**Rival Networks**

35.     In the event that the defendants' NSRs are adjudged illegal and are ordered rescinded in this action, then no major payment card network -- including American Express and Discover Card -- will impose a no-surcharge rule upon merchants.  Neither American Express nor Discover includes such a rule in its standard form card acceptance agreements with merchants, but both include a rule that merchants may not "discriminate" against Amex or Discover, or treat their cards any differently than those of Visa, MasterCard or any other network.

36.     Upon a judgment or agreement rescinding Visa's NSR, there will be no contractual restraint against merchants imposing surcharges.  Nor are there any federal statutory restraints against the imposition of surcharges.  Nor, in 41 states plus the District of Columbia, are there any state law restraints of any nature against the imposition of surcharges.

**Surcharge Mark-Ups**

37.     The instant action challenges the NSR.  Plaintiffs do not, however, purport to challenge as anticompetitive any contractual restriction imposed by Visa, Mastercard or their member banks upon the ability of merchants to pass along to consumers a surcharge in an amount materially greater than the actual, applicable discount fee imposed by Visa, Mastercard and their member banks and materially greater than the amount necessary for the merchant efficiently to

10

institute a procompetitive surcharge.  Nor do plaintiffs in this antitrust action purport to challenge any contractual requirement that Visa, Mastercard or their member banks may impose mandating that surcharge rates must be reasonably posted or published by the retailer.

**Market Definition**

38.     General purpose credit card services form the product dimension of a relevant market for antitrust purposes.  The geographic dimension of this market is the United States.

39.     Debit card services form the product dimension of another relevant market for antitrust purposes.  The geographic dimension of this market is the United States.

40.     Significant barriers to entry exist in both the credit card services and debit card services markets.

**Damages**

41.     In the absence of the NSR, the merchant discount rate for Visa or MasterCard credit card services applicable to any given merchant during the Statutory Period would not have exceeded the baseline competitive rate for such services.  The difference between those comparison rates and the rates actually charged by Visa and MasterCard to the merchant during the Class Period are referred to herein as the "Credit Card Rate Differential."

42.     In the absence of the NSR, the merchant discount rate for Visa or MasterCard debit card services applicable to any given merchant during the Class Period would not have exceeded the baseline competitive rate for such services.   The difference between those comparison rates and the rates actually charged by Visa and MasterCard to the merchant during the Class Period for debit card services shall be referred to as the "Debit Card Rate Differential."

43.     Plaintiffs' claims for damages incurred on or before December 31, 2003 have been released as part of the settlement of Wal-Mart Stores v. Visa USA, Inc., 396 F.3d 96, 110 (2d Cir. 2005) (2d Cir. 2005).  Conduct occurring after December 31, 2003, however, remains unaffected by the releases in that case and is not precluded from being the subject of the instant action (the "Damages Period").

///

///

11

## FIRST CLAIM FOR RELIEF

(Against Visa For Violation of Section 2 of The Sherman Act --

Intentional Monopolization of Credit Card Services Market)

44.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

45.     Defendant Visa has and exercises monopoly power in the general purpose credit card services market.

46.     The NSR furthers and protects Visa's monopoly power in this market by ensuring that no competitor can make inroads on Visa's market position by offering cheaper or more efficient credit card services to merchants.

47.     The NSR harms the competitive process and thereby harms consumers.

48.     Visa's intentional monopolization of the credit card services market harms the competitive process and thereby harms consumers.

49.     There exists no procompetitive justification for the NSR.

50.     As a direct and foreseeable result of defendant Visa USA's willful maintenance of its monopoly power in the credit card services market by the anticompetitive device of the NSR, plaintiffs have been injured in an amount to be determined at trial, but not less than an amount equal to (i) the Credit Card Rate Differential, multiplied by (ii) the plaintiffs' total charge volume on Visa credit cards during the Damages Period.


## SECOND CLAIM FOR RELIEF

(Against Visa For Violation of Section 2 of The Sherman Act --

Intentional Monopolization of Debit Card Services Market)

51.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

52.     Defendant Visa has and exercises monopoly power in the debit card services market.

///

12

53. The NSR furthers and protects Visa's monopoly power in this market by ensuring that no competitor can make inroads on Visa's market position by offering cheaper or more efficient debit card services to merchants.

54. The NSR harms the competitive process and thereby harms consumers.

55. Visa's intentional monopolization of the debit card services market harms the competitive process and thereby harms consumers.

56. There exists no procompetitive justification for the NSR.

57. As a direct and foreseeable result of defendant Visa USA's willful maintenance of its monopoly power in the debit card services market by the anticompetitive device of the NSR, plaintiffs have been injured in an amount to be determined at trial, but not less than an amount equal to (i) the Debit Card Rate Differential, multiplied by (ii) the plaintiffs' total charge volume on Visa debit cards during the Damages Period.

## THIRD CLAIM FOR RELIEF

(Against Visa and MasterCard For Violation of Section 1 of The Sherman Act)

58. Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

59. Defendants Visa and MasterCard, singly and jointly, have and exercise market power in the general purpose credit card services market and in the debit card services market.

60. The NSR, imposed upon merchant plaintiffs by Visa and MasterCard through their acquirer banks, represents an unlawful contract in restraint of trade.   Among other things, the NSR represents a vertical restraint that has the clear effect of restraining interbrand (i.e., horizontal) competition in the markets for credit card and debit card services.

61. The NSR is anticompetitive.  Among its anticompetitive effects are the inflationary pressure it exerts on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of defendants' high cost payment media, the entrenchment of Visa's and MasterCard's market position and the insulation of Visa and

13

1   MasterCard from any competitive threat from a rival offering cheaper or more efficient credit or

2   debit card services.

3       62.     There exists no procompetitive justification for the NSR.

4       63.     As a direct and foreseeable result of defendants willful imposition of the NSR,

5   plaintiffs have been injured in an amount to be determined at trial.

6

7                       **FOURTH CLAIM FOR RELIEF**

8           (Against Visa and MasterCard For Conspiracy to Monopolize

9               In Violation of Section 2 of The Sherman Act)

10      64.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set

11  forth herein.

12      65.     Defendants Visa and MasterCard, along with unnamed co-conspirator member

13  banks, have engaged in a single continuing combination and conspiracy to restrain competition in

14  the relevant markets for debit and credit card services, in violation of Section 2 of the Sherman

15  Act, 15 U.S.C. § 2.

16      66.     In furtherance of this continuing combination and conspiracy, the Associations,

17  acting in concert with and through their member banks, have agreed to abide by a single policy of

18  causing the acquirer banks of both Associations -- many of whom are acquirers for both

19  Associations -- to impose the NSR upon the merchants with whom they contract.

20      67.     The direct and foreseeable consequence and object of the conspiracy is to preclude

21  competition in the relevant markets based upon price, to achieve and maintain for the

22  conspirators, as a group, dominion and control over the  relevant markets.

23      68.     This conspiracy has caused significant harm to competition in the relevant

24  markets.

25

26  WHEREFORE, plaintiffs respectfully seek an Order:

27      A.      Directing that the instant action may be maintained as a Class Action, on behalf of

28  the Class defined above;

                                14

     B.     Declaring that the No Surcharge Rule, as maintained by defendant Visa, is illegal to the extent it precludes members of the Class from passing along a surcharge, at a disclosed rate, in the approximate amount of the actual discount fee applicable to the particular transaction at hand;

     C.     Awarding damages in an amount to be proven at trial;

     D.     Awarding attorneys' fees and costs of suit; and

     E.     Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiffs hereby demand trial by jury of all issues so triable.

DATED: July 19, 2005

Respectfully submitted,

MARKUN ZUSMAN & COMPTON LLP

By: _____

David S. Markun
Edward S. Zusman
Kevin K. Eng
Attorneys for Plaintiffs

CLASS ACTION COMPLAINT

# Exhibit B

David S. Markun (CA State Bar No. 108067)
Edward S. Zusman (CA State Bar No. 154366)
Kevin K. Eng (CA State Bar No. 209036)
MARKUN ZUSMAN & COMPTON, LLP
465 California Street, Suite 500
San Francisco, CA 94104
Telephone: (415) 438-4515
Facsimile: (415) 434-4505

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**MMC**

RANDALL JASPERSON d/b/a JASPERSON SOD SERVICE, on behalf of himself and all others similarly situated,

Plaintiff,

v.

VISA U.S.A., INC. and MASTERCARD INTERNATIONAL, INC.,

Defendants.

Case No. **C 05 2996**

COMPLAINT

CLASS ACTION

DEMAND FOR JURY TRIAL

Plaintiff Randall Jasperson d/b/a Jasperson Sod Service, on behalf of himself and all others similarly situated, alleges for his complaint against Visa USA, Inc. ("Visa") and MasterCard International, Inc. ("MasterCard"), upon knowledge with respect to his own acts and upon information and belief with respect to all other matters, as follows:

## I.

## **INTRODUCTION**

1.     This antitrust class action, asserted on behalf of merchants that accept Visa-branded and MasterCard-branded payment cards, challenges the rules of the Visa and MasterCard associations (together, the "Associations") forbidding merchants from passing along to

1

1   cardholders a discrete surcharge to account for the fees that the merchant is forced to pay

2   defendant and its member banks in connection with transactions effected on defendants' payment

3   cards (the "No-Surcharge Rule" or "NSR").

4          2.      As set forth below, the No-Surcharge Rule is anticompetitive.  It raises the prices

5   of goods and services for all consumers because merchants, seeking to pass along the costs they

6   incur to process payment transactions on the Associations' network, are forced to increase the

7   prices of goods and services to all of their customers.  Under the NSR, merchants are prohibited

8   from assessing the costs of Visa and MasterCard transactions directly upon those consumers who

9   elect to use Visa or MasterCard payment cards.  The No-Surcharge Rule thus forces merchants --

10  and their customers who pay with cash or low cost plastic payment media -- to subsidize all of the

11  benefits received by Visa and MasterCard cardholders, including frequent flier miles, cash-back

12  rewards and other costly perquisites.

13         3.      The No-Surcharge Rule also insulates the defendants from any efficiency-based

14  competitive threat.  In the absence of the No-Surcharge Rule, plaintiff and merchants based in

15  some 41 other states would be free to impose a surcharge on plastic payment cards in the amount

16  of the so-called "discount fees" paid to Visa and the other payment networks.  In the face of such

17  surcharges, consumers would be free to (and would) migrate away from "expensive" payment

18  media, such as Visa, MasterCard or American Express, and towards less expensive payment cards

19  -- i.e., cards that carry lower "discount fees," and hence lower surcharges.   In other words, if

20  merchants were free to impose a surcharge, a network offering payment processing services to

21  merchants at a lower fee would be able to gain market share by attracting cardholders as well as

22  merchants.  The No-Surcharge Rule, however, flatly ensures that defendants' monopoly power

23  will never be challenged by a competitor's ability to deliver payment card processing services at a

24  lower cost.  The NSR, then, is the ultimate monopoly maintenance device.

25         4.      Finally, in the face of all of these anticompetitive effects -- including (a) inflating

26  the cost of retail goods and services, (b) compelling users of low-cost payment media to subsidize

27  the frequent flier miles and other perquisites enjoyed by users of high-cost payment media, and

28  (c) the flat-out permanent entrenchment of defendant's monopoly position against any efficiency-

1   based threat -- there is simply no procompetitive justification whatsoever for the No-Surcharge

2   Rule.

3       5.      For all of these reasons, the No-Surcharge Rule constitutes an unlawful monopoly

4   maintenance device, in violation of the Sherman Act § 2, and an unreasonable contract in restraint

5   of trade, in violation of the Sherman Act § 1.

6                                                **II.**

7                               **JURISDICTION AND VENUE**

8       6.      Pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to

9   prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.  In

10  addition, Plaintiff seeks damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

11      7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22

12  and 26, because the Associations may be found or transact business within this District.  Among

13  other things, Visa, MasterCard and their respective member banks market the Associations'

14  payment card processing services to thousands of merchants within this District, and defendant

15  Visa is headquartered in this District.

16                                               **III.**

17                             **INTRADISTRICT ASSIGNMENT**

18      8.      Assignment to the San Francisco Division of this District is proper pursuant to

19  Civil Local Rule 3-2 because a substantial part of the events or omissions which give rise to this

20  action occurred, and are occurring, in the county of San Francisco.

21                                               **IV.**

22                                    **THE PARTIES**

23      9.      Plaintiff Jasperson Sod Service is a Wisconsin sole proprietorship with its

24  principal place of business in Franksville, Wisconsin.

25      10.     Defendant Visa is a Delaware corporation.  At all relevant times, Visa was a

26  national bankcard association whose members included more than 6,000 banks.  Visa's principal

27  place of business is San Francisco, California.  Visa transacts business within this District.

28  ///

                                                  3

11.     Defendant MasterCard is a Delaware corporation.  At all relevant times, MasterCard was a national bankcard association whose members included more than 6,000 banks.  MasterCard's principal place of business is Purchase, New York.

## V.

## CLASS ACTION ALLEGATIONS

12.     Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(b)(2) to restrain an unlawful practice under Sections 1 and 2 of the Sherman Act, and as a damages class action under Rule 23(b)(3).

13.     The class is comprised of all merchants that have accepted Visa and/or Mastercard-branded payment cards during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") throughout the United States (the "Class").  The Class does not include Visa, Mastercard, and their member banks, their subsidiaries or affiliates.

14.     The members of the Class are so numerous that joinder of all members is impracticable.  There exist no conflicts of interest as between the named plaintiff and the other Class members.

15.     The named plaintiff has retained counsel that is competent and experienced in federal antitrust and class action litigation.  Plaintiff and his counsel will fairly and adequately represent the interests of the Class.

16.     In relevant respect, defendants have acted and continue to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate.

17.     This class action is superior to any other method for the fair and efficient adjudication of this dispute.  There will be no extraordinary difficulty in the management of this class action.

18.     Throughout the Statutory Period, the Associations have uniformly imposed the No-Surcharge Rule upon all Class members.  All Class members have been damaged in precisely the same fashion, by precisely the same conduct.  The degree of damages suffered by individual Class members is readily calculable according to an ascertainable formula.  For all of these

4

reasons, questions of law and fact will predominantly be common to the Class. Among the questions of law and fact common to the Class are:

(i)      Whether the Associations and their member banks demand from merchants, as a condition of being permitted to accept defendant's branded payment cards, that the merchant may not assess a discrete surcharge to the consumer in the amount of the actual discount fee that the merchant incurs;

(ii)     Whether Visa's and MasterCard's imposition of the No-Surcharge Rule serves to entrench their monopoly position in the marketplace;

(iii)     Whether defendants' imposition of the No-Surcharge Rule forces merchants and those consumers who make purchases on relatively low-cost payment media (such as cash or on-line debit cards) to subsidize the perquisites and benefits enjoyed by users of high-cost payment media, including defendant's branded credit and debit cards; and

(iv)     Whether the merchant discount rates that members of the Class have been forced to pay for Visa and MasterCard credit and debit card transactions exceed the rates that would prevail in the absence of the No-Surcharge Rule.

## VI.

## FACTUAL BACKGROUND

19.     Visa and MasterCard are associations comprised of member banks. One function of the member banks is to issue credit and debit cards to their customers bearing the Visa or MasterCard logo. In this capacity, they are known as "issuer banks." Another function of the banks is to acquire and service merchant accounts for the Visa and MasterCard networks; in this capacity, they are referred to as "acquirer banks."

20.     The acquirer banks contract with merchants using form agreements approved by the Associations. These agreements contain terms that are mandated by the Associations. One such term, mandated by both Associations, is the No-Surcharge Rule. A typical iteration of the NSR directs that the merchant: "shall not impose any surcharge or fee for accepting a [Visa-

///

5

branded] Card" and further provides that the merchant "shall not establish procedures that discourage, favor or discriminate against the use of any particular [Visa- branded] Card."

21.     On behalf of Visa or MasterCard, the acquirer banks charge merchants "discount fees" in connection with processing transactions on the Associations' payment networks. The vast bulk of those discount fees -- typically more than 80% -- are comprised of the "interchange fee," which refers to the fees collected by the issuing bank. The remainder of the merchant discount fee is paid to the acquirer bank and to the association itself. The level of interchange fees is centrally set by each Association.

22.     The discount fees charged to merchants for transactions effected on various payment card products vary widely. Depending on variables such as industry and annual charge volume, a schedule of the discount fees facing a small merchant might – just for the sake of illustration -- include the following:

| Visa credit: | 2.50 | % |
|---|---|---|
| MC credit: | 2.50 | % |
| Visa signature debit: | 1.80 | % |
| MC signature debit: | 1.80 | % |
| Discover Card: | 1.60 | % |
| American Express: | 3.00 | % |
| PIN-based debit: | 0.25 | % |

23.     On the foregoing example, then, the small merchant will receive $99.75 when a $100 retail transaction is processed on a PIN-based debit card. By contrast, where that same $100 transaction is processed on a Visa or MasterCard credit card, the merchant in this example will receive only $97.50.

24.     The No-Surcharge Rule ensures that both PIN-based debit card users and Visa and MasterCard credit card users will pay the same amount at the point of sale, no matter how much the merchant stands to receive. It ensures that the consumer is indifferent to, and ignorant of, the cost of the payment card she has decided to pull out of her wallet. She does not care if the cost to the merchant of processing the transaction on that card is $2.50 or twenty-five cents.

6

25.     In the absence of the No-Surcharge Rule, by contrast, consumers would have information concerning the cost of each payment medium, and an incentive to switch from more expensive to less expensive payment media. Faced with a schedule of surcharges similar to the above table, consumers will migrate away from expensive payment options, such as defendants' credit cards or American Express payment cards. The result will be competition, in which each Association will be forced to reduce the centrally set price of its services to merchants or lose market share to more efficient rivals. Because of the interchange system, each Association will be able to respond efficiently to the introduction of price-based competition in the market for payment card services, upon abolition of the NSR.

**Anticompetitive Effects of the NSR:**
**Inflation, Forced Subsidies and Monopoly Maintenance**

26.     By preventing the merchant from passing its payment card services costs along narrowly, via a discrete surcharge to those customers who actually use the payment service, the NSR has a profound inflationary effect on retail goods and services. It is a matter of fundamental economics that merchants pass along to consumers at least some portion of their payment processing costs. The No-Surcharge Rule ensures that, in order to pay for the defendants' payment processing services, merchants must raise prices to *all* consumers, including cash-payers and those who would otherwise seek to avoid the high cost of credit card processing services. But for the NSR, then, consumer prices would be lower: the price of goods and services would fall, because those prices would no longer be marked up to reflect merchant discount fees.

27.     By the same token, the No-Surcharge Rule effectively mandates that consumers paying by cash, check and low-cost plastic payment media (such as PIN-based debit) must subsidize the costly goods and services enjoyed by Visa or MasterCard credit card users, including such perquisites as frequent flier miles, rental car insurance, free gifts, fraud protection and even cash rewards. These costly perquisites are financed by merchant discount fees. The NSR thus ensures that the cost of these benefits will not be internalized by the cardholders who enjoy them. Instead, the NSR ensures that these costly benefits must be financed by merchants

///

7

1   and -- to the extent merchants pass along their payment services costs via general price increases -

2   - by all of their customers, including users of low-cost payment media.

3       28.     The forced subsidization of high-cost payment media users creates a vicious circle

4   for merchants and their customers.  The more cardholders use high-cost payment media such as

5   Visa or MasterCard credit cards, the more merchants are required to pay in discount fees.  The

6   Associations use these fees to finance benefits with which they entice yet more cardholders into

7   their network.  This causes the merchant to incur even more of the high discount fees associated

8   with Visa and MasterCard payment cards.  And the more merchants are required to pay in

9   discount fees, the more they must raise prices for all consumers.  The merchants are not the only

10  big losers in this equation.  Consumers paying by cash, check, food stamps, on-line debit card and

11  other relatively lower cost payment media are significantly injured as well.

12      29.     If the merchant were free to pass along the discount fee *directly* to the card user

13  via a discrete surcharge, the forced subsidy would disappear.  The users of high cost payment

14  cards would themselves fund whatever benefits and conveniences they receive from the payment

15  cards they elect to use.  Customers who choose to use an expensive payment medium would pay

16  for the privilege.  While an affluent shopper who is 200 points shy of a free trip to Hawaii may

17  not balk at an extra two dollars on her check-out ticket, the cash-payer and on-line debit user will

18  be relieved of the obligation to subsidize that particular junket.

19      30.     But for the NSR, moreover, the discount fees confronting the merchant would

20  themselves be far lower.  Faced with the prospect of a $2.50 surcharge for using a Visa credit

21  card, many consumers would shift to cheaper payment media, such as Discover Card (around

22  $1.50 for this $100 ticket) or offline debit (around $1) or online PIN -based debit-cards

23  (approximately 25 cents).  Inevitably, the Visa, MasterCard and American Express networks

24  would significantly and swiftly reduce their centrally set interchange rates, as payment card

25  networks compete to offer lower discount rates and retain cardholders.

26      31.     The NSR serves to entrench the Associations' monopoly position.  Indeed, it

27  safeguards the defendants' market dominance against any threat from a competitor who might

28  seek to gain market share by offering credit or debit card payment processing services to

merchants at a cheaper price. The NSR mandates that the consumer's determination of which network is used for any particular transaction will not be affected by the costliness or inefficiency of the network services. It is the consumer who chooses upon what network her retail transaction will be processed. But in making this choice, she neither knows nor has reason to care that the defendants' fees may be several times that of a competitive payment mechanism. Accordingly, if tomorrow a new card network were to offer every merchant in the US credit card services for free, that network would gain no market share from the monopolist Associations because the NSR ensures the consumer will have no incentive to use the cheaper network. Indeed, the NSR ensures perversely that consumers will prefer the more costly network, which will shower them with frequent flier miles and other benefits.

32.    The NSR thus guarantees Visa that its monopoly position -- and MasterCard that its shared monopoly position -- will not be threatened by a rival who has developed a way to deliver credit and debit card services more efficiently. It ensures that the dominant networks are insulated from efficiency-based competition and are free to extract massive monopoly rents through supra-competitive (indeed, non-competitive) merchant discount fees.

33.    All of these anticompetitive effects of the NSR are heightened by the fact that technology now exists to tack the "true" surcharge -- representing the merchant's actual discount fee for the transaction at issue -- onto the check-out ticket at the point of sale automatically, through a swipe of the payment card. Technological innovation in the development of more efficient payment systems is thus also being retarded by the defendant's continued maintenance of the NSR.

34.    If U.S. merchants were free to use at the point of sale a card swiper programmed to tack onto the check-out ticket a surcharge reflecting the discount fee imposed by the payment network for the transaction at issue, enough merchants would do so (or credibly threaten to do so) that the discount fees charged to all merchants would drop down to a level no higher than the rate currently charged for such services by the lowest cost comparable provider of such services.

///

///

9

**Rival Networks**

35.   In the event that the defendants' NSRs are adjudged illegal and are ordered rescinded in this action, then no major payment card network -- including American Express and Discover Card -- will impose a no-surcharge rule upon merchants.  Neither American Express nor Discover includes such a rule in its standard form card acceptance agreements with merchants, but both include a rule that merchants may not "discriminate" against Amex or Discover, or treat their cards any differently than those of Visa, MasterCard or any other network.

36.   Upon a judgment or agreement rescinding Visa's NSR, there will be no contractual restraint against merchants imposing surcharges.  Nor are there any federal statutory restraints against the imposition of surcharges.  Nor, in 41 states plus the District of Columbia, are there any state law restraints of any nature against the imposition of surcharges.

**Surcharge Mark-Ups**

37.   The instant action challenges the NSR.  Plaintiff does not, however, purport to challenge as anticompetitive any contractual restriction imposed by Visa, MasterCard or their member banks upon the ability of merchants to pass along to consumers a surcharge in an amount materially greater than the actual, applicable discount fee imposed by Visa, MasterCard and their member banks and materially greater than the amount necessary for the merchant efficiently to institute a procompetitive surcharge.  Nor does plaintiff in this antitrust action purport to challenge any contractual requirement that Visa, Mastercard or their member banks may impose mandating that surcharge rates must be reasonably posted or published by the retailer, provided such posting does not impede the plaintiff's business.

**Market Definition**

38.   General purpose credit card services form the product dimension of a relevant market for antitrust purposes.  The geographic dimension of this market is the United States.

39.   Debit card services form the product dimension of another relevant market for antitrust purposes.  The geographic dimension of this market is the United States.

40.   Significant barriers to entry exist in both the credit card services and debit card services markets.

10

**Damages**

41.    In the absence of the NSR, the merchant discount rate for Visa or MasterCard credit card services applicable to any given merchant during the Statutory Period would not have exceeded the baseline competitive rate for such services.  The difference between those comparison rates and the rates actually charged by Visa and MasterCard to the merchant during the Class Period are referred to herein as the "Credit Card Rate Differential."

42.    In the absence of the NSR, the merchant discount rate for Visa or MasterCard debit card services applicable to any given merchant during the Class Period would not have exceeded the baseline competitive rate for such services.  The difference between those comparison rates and the rates actually charged by Visa and MasterCard to the merchant during the Class Period for debit card services shall be referred to as the "Debit Card Rate Differential."

43.    Plaintiffs' claims for damages incurred on or before December 31, 2003 have been released as part of the settlement of *Wal-Mart Stores v. Visa USA, Inc.*, 396 F.3d 96, 110 (2d Cir. 2005) (2d Cir. 2005).  Conduct occurring after December 31, 2003, however, remains unaffected by the releases in that case and is not precluded from being the subject of the instant action (the "Damages Period").

### FIRST CLAIM FOR RELIEF
(Against Visa For Violation of Section 2 of The Sherman Act --
Intentional Monopolization of Credit Card Services Market)

44.    Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

45.    Defendant Visa has and exercises monopoly power in the general purpose credit card services market.

46.    The NSR furthers and protects Visa's monopoly power in this market by ensuring that no competitor can make inroads on Visa's market position by offering cheaper or more efficient credit card services to merchants.

47.    The NSR harms the competitive process and thereby harms consumers.

///

11

48.    Visa's intentional monopolization of the credit card services market harms the competitive process and thereby harms consumers.

49.    There exists no procompetitive justification for the NSR.

50.    As a direct and foreseeable result of defendant Visa USA's willful maintenance of its monopoly power in the credit card services market by the anticompetitive device of the NSR, plaintiffs have been injured in an amount to be determined at trial, but not less than an amount equal to (i) the Credit Card Rate Differential, multiplied by (ii) the plaintiffs' total charge volume on Visa credit cards during the Damages Period.

### SECOND CLAIM FOR RELIEF
(Against Visa For Violation of Section 2 of The Sherman Act --
Intentional Monopolization of Debit Card Services Market)

51.    Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

52.    Defendant Visa has and exercises monopoly power in the debit card services market.

53.    The NSR furthers and protects Visa's monopoly power in this market by ensuring that no competitor can make inroads on Visa's market position by offering cheaper or more efficient debit card services to merchants.

54.    The NSR harms the competitive process and thereby harms consumers.

55.    Visa's intentional monopolization of the debit card services market harms the competitive process and thereby harms consumers.

56.    There exists no procompetitive justification for the NSR.

57.    As a direct and foreseeable result of defendant Visa USA's willful maintenance of its monopoly power in the debit card services market by the anticompetitive device of the NSR, plaintiffs have been injured in an amount to be determined at trial, but not less than an amount equal to (i) the Debit Card Rate Differential, multiplied by (ii) the plaintiffs' total charge volume on Visa debit cards during the Damages Period.

12

### THIRD CLAIM FOR RELIEF
(Against Visa and MasterCard For Violation of Section 1 of The Sherman Act)

58.     Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

59.     Defendants Visa and MasterCard, singly and jointly, have and exercise market power in the general purpose credit card services market and in the debit card services market.

60.     The NSR, imposed upon merchant plaintiffs by Visa and MasterCard through their acquirer banks, represents an unlawful contract in restraint of trade.  Among other things, the NSR represents a vertical restraint that has the clear effect of restraining *inter*brand (i.e., horizontal) competition in the markets for credit card and debit card services.

61.     The NSR is anticompetitive.  Among its anticompetitive effects are the inflationary pressure it exerts on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of defendants' high cost payment media, the entrenchment of Visa's and MasterCard's market position and the insulation of Visa and MasterCard from any competitive threat from a rival offering cheaper or more efficient credit or debit card services.

62.     There exists no procompetitive justification for the NSR.

63.     As a direct and foreseeable result of defendants willful imposition of the NSR, plaintiffs have been injured in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
(Against Visa and MasterCard For Conspiracy to Monopolize
In Violation of Section 2 of The Sherman Act)

64.     Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

65.     Defendants Visa and MasterCard, along with unnamed co-conspirator member banks, have engaged in a single continuing combination and conspiracy to restrain competition in the relevant markets for debit and credit card services, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

13

1       66.    In furtherance of this continuing combination and conspiracy, the Associations,

2  acting in concert with and through their member banks, have agreed to abide by a single policy of

3  causing the acquirer banks of both Associations -- many of whom are acquirers for both

4  Associations -- to impose the NSR upon the merchants with whom they contract.

5       67.    The direct and foreseeable consequence and object of the conspiracy is to preclude

6  competition in the relevant markets based upon price, to achieve and maintain for the

7  conspirators, as a group, dominion and control over the relevant markets.

8       68.    This conspiracy has caused significant harm to competition in the relevant

9  markets.

10  WHEREFORE, plaintiff respectfully seeks an Order:

11       A.    Directing that the instant action may be maintained as a Class Action, on behalf of

12  the Class defined above;

13       B.    Declaring that the No Surcharge Rule, as maintained by defendant Visa, is illegal

14  to the extent it precludes members of the Class from passing along a surcharge, at a disclosed

15  rate, in the approximate amount of the actual discount fee applicable to the particular transaction

16  at hand;

17       C.    Awarding damages in an amount to be proven at trial;

18       D.    Awarding attorneys' fees and costs of suit; and

19       E.    Granting such other and further relief as this Court may deem just and proper.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

CLASS ACTION COMPLAINT

## JURY DEMAND

Plaintiff hereby demands trial by jury of all issues so triable.

DATED: July 22, 2005

Respectfully submitted,

MARKUN ZUSMAN & COMPTON LLP

By: _____

David S. Markun
Edward S. Zusman
Kevin K. Eng
Attorneys for Plaintiffs

Karl Cambronne
CHESTNUT & CAMBRONNE
3700 Mithun Tower
222 South Ninth Street
Minneapolis, MN 55402
Telephone: (612) 339-7300
Facsimile: (612) 336-2940

15

# Exhibit C

**DUPLICATE**

FILED IN CLERKS OFFICE
U.S.D.C. - Atlanta

MAY 06 2005

LUTHER D. THOMAS, Clerk
By:
        Deputy Clerk

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| ANIMAL LAND, INC., on behalf of itself and all others similarly situated, ) ) ) | Civil Action No. |
| Plaintiff, ) ) ) | **1:05-CV-1210** |
| v. ) ) | **CLASS ACTION COMPLAINT** |
| VISA U.S.A., INC., ) ) | **DEMAND FOR JURY TRIAL** |
| Defendant ) ) | |

Plaintiff Animal Land, Inc., on behalf of itself and all others similarly situated, alleges for its complaint against Visa USA, Inc. ("Visa"), upon knowledge with respect to its own acts and upon information and belief with respect to all other matters, as follows:

## I.

## INTRODUCTION

1.    This antitrust class action, asserted on behalf of merchants that accept Visa-branded payment cards, challenges Visa's rules forbidding merchants from passing along to cardholders a discrete surcharge to account for the fees that the merchant is forced to pay defendant and its member banks in connection with transactions effected on defendants' payment cards (the "No-Surcharge Rule" or "NSR").

2.    As set forth below, the No-Surcharge Rule is anticompetitive. It raises the prices of goods and services for all consumers because merchants, seeking to pass along the costs they incur to process payment transactions on the Visa network, are forced to increase the prices of goods and services to all of their customers.  Under the NSR, merchants are prohibited from assessing the costs of Visa transactions directly upon those consumers who elect to use Visa payment cards.  The No-Surcharge Rule thus forces merchants -- and their customers who pay with cash or low cost plastic payment media -- to subsidize all of the benefits received by Visa cardholders, including frequent flier miles, cash-back rewards and other costly perquisites.

3.    The No-Surcharge Rule also insulates Visa from any efficiency-based competitive threat.  In the absence of the No-Surcharge Rule, plaintiff Animal Land and other merchants in Georgia and some 41 other states would be free to impose a surcharge on plastic payment cards in the amount of the so-called "discount fees" paid to Visa and the other payment networks.  In the face of such surcharges, consumers would be free to (and would) migrate away from "expensive" payment media, such as Visa or American Express, and towards less expensive payment cards -- i.e., cards that carry lower "discount fees," and hence lower surcharges.   In other

2

words, if merchants were free to impose a surcharge, a network offering payment processing services to merchants at a lower fee would be able to gain market share by attracting cardholders as well as merchants. The No-Surcharge Rule, however, flatly ensures that defendants' monopoly power will <u>never</u> be challenged by a competitor's ability to deliver payment card processing services at a lower cost. The NSR, then, is the ultimate monopoly maintenance device.

    4.    Finally, in the face of all of these anticompetitive effects -- including (a) inflating the cost of retail goods and services, (b) compelling users of low-cost payment media to subsidize the frequent flier miles and other perquisites enjoyed by users of high-cost payment media, and (c) the flat-out permanent entrenchment of defendant's monopoly position against any efficiency-based threat -- there is simply no procompetitive justification whatsoever for the No-Surcharge Rule.

    5.    For all of these reasons, the No-Surcharge Rule constitutes an unlawful monopoly maintenance device, in violation of the Sherman Act § 2, and an unreasonable contract in restraint of trade, in violation of the Sherman Act § 1.

## II.
## <u>JURISDICTION AND VENUE</u>

6.    Pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.  In addition, Plaintiff seeks damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22 and 26, because Visa "may be found or transacts business" within this District.  Among other things, Visa and its member banks market defendant's payment card processing services to thousands of merchants within this District, including plaintiff Animal Land, Inc., which is located within this District.

### III.

### THE PARTIES

8.    Plaintiff Animal Land, Inc. is a corporation organized under the laws of the State of Georgia with its principal place of business in Atlanta, Georgia.

9.    Defendant Visa is a Delaware corporation.  At all relevant times, Visa was a national bankcard association whose members included more than 6,000 banks.  Visa's principal place of business is San Francisco, California.  Visa transacts business within this District.

### IV.

### CLASS ACTION ALLEGATIONS

10. Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(b)(2) to restrain an unlawful practice under Sections 1 and 2 of the Sherman Act, and as a damages class action under Rule 23(b)(3).

11. The class is comprised of all merchants that have accepted Visa-branded payment cards during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") throughout the United States (the "Class"). The Class does not include Visa, its member banks, their subsidiaries or affiliates.

12. The members of the Class are so numerous that joinder of all members is impracticable.

13. There exist no conflicts of interest as between the named plaintiffs and the other Class members.

14. Plaintiffs have retained counsel that is competent and experienced in federal antitrust and class action litigation. Plaintiffs and their counsel will fairly and adequately represent the interests of the Class.

15. In relevant respect, defendants have acted and continue to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate.

16. This class action is superior to any other method for the fair and efficient adjudication of this dispute. There will be no extraordinary difficulty in the management of this class action.

17. Throughout the Statutory Period, Visa has uniformly imposed the No-Surcharge Rule upon all Class members. All Class members have been damaged in precisely the same fashion, by precisely the same conduct. The degree of damages suffered by individual Class members is readily calculable according to an ascertainable formula. For all of these reasons,

questions of law and fact will predominantly be common to the Class.
Among the questions of law and fact common to the Class are:

(i)   Whether Visa and its member banks demand from merchants,
as a condition of being permitted to accept defendant's branded
payment cards, that the merchant may not assess a discrete
surcharge to the consumer in the amount of the actual discount
fee that the merchant incurs;

(ii)  Whether Visa's imposition of the No-Surcharge Rule serves to
entrench its monopoly position in the marketplace;

(iii) Whether defendant's imposition of the No-Surcharge Rule
forces merchants and those consumers who make purchases on
relatively low-cost payment media (such as cash or on-line
debit cards) to subsidize the perquisites and benefits enjoyed by
users of high-cost payment media, including defendant's
branded credit and debit cards; and

(iv)  Whether the merchant discount rates that members of the Class
have been forced to pay for Visa credit and debit card
transactions exceed the rates that would prevail in the absence
of the No-Surcharge Rule.

## V.

## FACTUAL BACKGROUND

18.   Visa is an association comprised of member banks.  One
function of the member banks is to issue credit and debit cards to their
customers bearing the Visa logo.  In this capacity, they are known as "issuer

banks." Another function of the banks is to acquire and service merchant accounts for the Visa network; in this capacity, they are referred to as "acquirer banks."

19.   The acquirer banks contract with merchants using form agreements approved by the Visa association.  These agreements contain terms that are mandated by the Visa association.  One such term, mandated by Visa, is the No-Surcharge Rule.  A typical iteration of the NSR directs that the merchant: "shall not impose any surcharge or fee for accepting a [Visa- branded] Card" and further provides that the merchant "shall not establish procedures that discourage, favor or discriminate against the use of any particular [Visa- branded] Card."

20.   On behalf of Visa, the acquirer banks charge merchants "discount fees" in connection with processing transactions on the Visa payment network.  The vast bulk of those discount fees -- typically more than 80% -- are comprised of the "interchange fee," which refers to the fees collected by the issuing bank.  The remainder of the merchant discount fee is paid to the acquirer bank and to the association itself.  The level of interchange fees is centrally set by the Visa association.

21.   The discount fees charged to merchants for transactions effected on various payment card products vary widely.  Depending on

variables such as industry and annual charge volume, a schedule of the discount fees facing a small merchant might - just for the sake of illustration -- include the following:

| | |
|---|---|
| Visa credit: | 2.50% |
| MC credit: | 2.50% |
| Visa signature debit: | 1.80% |
| MC signature debit: | 1.80% |
| Discover Card: | 1.60% |
| American Express: | 3.00% |
| PIN-based debit: | 0.25% |

22.    On the foregoing example, then, the small merchant will receive $99.75 when a $100 retail transaction is processed on a PIN-based debit card. By contrast, where that same $100 transaction is processed on a Visa credit card, the merchant in this example will receive only $97.50.

23.    The No-Surcharge Rule ensures that both the PIN-based debit card user and the Visa credit card user will pay the same amount at the point of sale, no matter how much the merchant stands to receive. It ensures that the consumer is indifferent to, and ignorant of, the cost of the payment card she has decided to pull out of her wallet. She does not care if the cost to the merchant of processing the transaction on that card is $2.50 or twenty-five cents.

24.     In the absence of the No-Surcharge Rule, by contrast, consumers would have information concerning the cost of each payment medium, and an incentive to switch from more expensive to less expensive payment media.  Faced with a schedule of surcharges similar to the above table, consumers will migrate away from expensive payment options, such as defendants' credit cards or American Express payment cards.  The result will be competition, in which defendant Visa will be forced to reduce the price of its services to merchants or lose market share to more efficient rivals.

**Anticompetitive Effects of the NSR:**
**Inflation, Forced Subsidies and Monopoly Maintenance**

25.     By preventing the merchant from passing its payment card services costs along narrowly, via a discrete surcharge to those customers who actually use the payment service, the NSR has a profound inflationary effect on retail goods and services.  It is a matter of fundamental economics that merchants pass along to consumers at least some portion of their payment processing costs.  The No-Surcharge Rule ensures that, in order to pay for the defendant's payment processing services, merchants must raise prices to *all* consumers, including cash-payers and those who would otherwise seek to avoid the high cost of credit card processing services.  But

9

for the NSR, then, consumer prices would be lower: the price of goods and services would fall, because those prices would no longer be marked up to reflect merchant discount fees.

26.     By the same token, the No-Surcharge Rule effectively mandates that consumers paying by cash, check and low-cost plastic payment media (such as PIN-based debit) must subsidize the costly goods and services enjoyed by Visa credit card users, including such perquisites as frequent flier miles, rental car insurance, free gifts, fraud protection and even cash rewards. These costly perquisites are financed by merchant discount fees. The NSR thus ensures that the cost of these benefits will not be internalized by the cardholders who enjoy them. Instead, the NSR ensures that these costly benefits must be financed by merchants and -- to the extent merchants pass along their payment services costs via general price increases -- by all of their customers, including users of low-cost payment media.

27.     The forced subsidization of high-cost payment media users creates a vicious circle for merchants and their customers. The more cardholders use high-cost payment media such as Visa credit cards, the more merchants are required to pay in discount fees. Visa uses these fees to finance benefits with which it entices yet more cardholders into its network.

This causes the merchant to incur even more of the high discount fees associated with Visa payment cards. And the more merchants are required to pay in discount fees, the more they must raise prices for all consumers. The merchants are not the only big losers in this equation. Consumers paying by cash, check, food stamps, on-line debit card and other relatively lower cost payment media are significantly injured as well.

28.     If the merchant were free to pass along the discount fee directly to the card user via a discrete surcharge, the forced subsidy would disappear. The users of high cost payment cards would themselves fund whatever benefits and conveniences they receive from the payment cards they elect to use. Customers who choose to use an expensive payment medium would pay for the privilege. While an affluent shopper who is 200 points shy of a free trip to Hawaii may not balk at an extra two dollars on her check-out ticket, the cash-payer and on-line debit user will be relieved of the obligation to subsidize that particular junket.

29.     But for the NSR, moreover, the discount fees confronting the merchant would themselves be far lower. Faced with the prospect of a $2.50 surcharge for using a Visa credit card, many consumers would shift to cheaper payment media, such as Discover Card (around $1.50 for this $100 ticket) or offline debit (around $1) or online PIN -based debit-cards

(approximately 25 cents). Inevitably, the discount rates charged by Visa, MasterCard and American Express would drop significantly, as payment card networks compete to offer lower discount rates and retain cardholders.

30.    The NSR serves to entrench Visa's monopoly position. Indeed, it safeguards the defendant's market dominance against any threat from a competitor who might seek to gain market share by offering credit or debit card payment processing services to merchants at a cheaper price. The NSR mandates that the consumer's determination of which network is used for any particular transaction will not be affected by the costliness or inefficiency of the network services. It is the consumer who chooses upon what network her retail transaction will be processed. But in making this choice, she neither knows nor has reason to care that Visa's fees may be several times that of a competitive payment mechanism. Accordingly, if tomorrow a new card network were to offer every merchant in the US credit card services for free, that network would gain no market share from the monopolist Visa because the NSR ensures the consumer will have no incentive to use the cheaper network. Indeed, the NSR ensures perversely that consumers will prefer the more costly network, which will shower them with frequent flier miles and other benefits.

12

31.    The NSR thus guarantees Visa that its monopoly position will not be threatened by a rival who has developed a way to deliver credit and debit card services more efficiently.  It ensures that the dominant networks are insulated from efficiency-based competition and are free to extract massive monopoly rents through supra-competitive (indeed, non-competitive) merchant discount fees.

32.    All of these anticompetitive effects of the NSR are heightened by the fact that technology now exists to tack the "true" surcharge -- representing the merchant's actual discount fee for the transaction at issue -- onto the check-out ticket at the point of sale automatically, through a swipe of the payment card.  Technological innovation in the development of more efficient payment systems is thus also being retarded by the defendant's continued maintenance of the NSR.

33.    If U.S. merchants were free to use at the point of sale a card swiper programmed to tack onto the check-out ticket a surcharge reflecting the actual discount fee imposed by the payment network for the transaction at issue, enough merchants would do so (or credibly threaten to do so) that the discount fees charged to all merchants would drop down to a level no higher than the rate currently charged for such services by the lowest cost comparable provider of such services.

### Rival Networks

34.    In the event that Visa's NSR is adjudged illegal and is ordered rescinded in this action, then no major payment card network -- including American Express, Discover Card and MasterCard -- will impose a no-surcharge rule upon merchants.  Neither American Express nor Discover includes such a rule in its standard form card acceptance agreements with merchant, but both include a rule that merchants may not "discriminate" against Amex or Discover, or treat their cards any differently than those of Visa, MasterCard or any other network.  MasterCard does presently impose such a rule against merchants in its agreements but, upon information and belief, MasterCard will agree to rescind its own no-surcharge rule in the United States prior to the trial of this action.  Alternatively, plaintiffs will timely seek to amend their Complaint to seek relief as against MasterCard.

35.    Upon a judgment or agreement rescinding Visa's NSR, there will be no contractual restraint against merchants imposing surcharges.  Nor are there any federal statutory restraints against the imposition of surcharges.  Nor, in 41 states plus the District of Columbia, are there any state law restraints of any nature against the imposition of surcharges.

### Surcharge Mark-Ups

14

36.    The instant action challenges the NSR.  Plaintiffs do not, however, purport to challenge any contractual restriction imposed by Visa or its member banks upon the ability of merchants to pass along to consumers a surcharge in an amount materially greater than the actual, applicable discount fee imposed by Visa and its member banks.  Nor do plaintiffs in this antitrust action purport to challenge any contractual requirement that Visa or its member banks may impose mandating that surcharge rates must be reasonably disclosed to the consumer.

**Market Definition**

37.    General purpose credit card services form the product dimension of a relevant market for antitrust purposes.  The geographic dimension of this market is the United States.

38.    Debit card services form the product dimension of another relevant market for antitrust purposes.  The geographic dimension of this market is the United States.

39.    Significant barriers to entry exist in both the credit card services and debit card services markets.

**Damages**

40.    In the absence of the NSR, the merchant discount rate for Visa credit card services applicable to any given merchant during the Statutory

15

Period would not have exceeded the baseline competitive rate for such services. The difference between those comparison rates and the rates actually charged by Visa to the merchant during the Class Period are referred to herein as the "Credit Card Rate Differential."

41.   In the absence of the NSR, the merchant discount rate for Visa debit card services applicable to any given merchant during the Class Period would not have exceeded the baseline competitive rate for such services. The difference between those comparison rates and the rates actually charged by Visa to the merchant during the Class Period for debit card services shall be referred to as the "Debit Card Rate Differential."

42.   Plaintiff's claims for damages incurred on or before December 31, 2003 have been released as part of the settlement of *Wal-Mart Stores v. Visa USA, Inc.*, 396 F.3d 96, 110 (2d Cir. 2005) (2d Cir. 2005).  Conduct occurring after December 31, 2003, however, remains unaffected by the releases in that case and is not precluded from being the subject of the instant action (the "Damages Period").

## FIRST CLAIM FOR RELIEF
(For Violation of Section 2 of The Sherman Act --
Intentional Monopolization of Credit Card Services Market)

43.    Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

44.    Defendant Visa has and exercises monopoly power in the general purpose credit card services market.

45.    The NSR furthers and protects Visa's monopoly power in this market by ensuring that no competitor can make inroads on Visa's market position by offering cheaper or more efficient credit card services to merchants.

46.    The NSR harms the competitive process and thereby harms consumers.

47.    Visa's intentional monopolization of the credit card services market harms the competitive process and thereby harms consumers.

48.    There exists no procompetitive justification for the NSR.

49.    As a direct and foreseeable result of defendant Visa USA's willful maintenance of its monopoly power in the credit card services market by the anticompetitive device of the NSR, plaintiffs have been injured in an amount to be determined at trial, but not less than an amount equal to (i) the Credit Card Rate Differential, multiplied by (ii) the plaintiffs' total charge volume on Visa credit cards during the Damages Period.

## SECOND CLAIM FOR RELIEF
(For Violation of Section 2 of The Sherman Act --
Intentional Monopolization of Debit Card Services Market)

50.    Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

51.    Defendant Visa has and exercises monopoly power in the debit card services market.

52.    The NSR furthers and protects Visa's monopoly power in this market by ensuring that no competitor can make inroads on Visa's market position by offering cheaper or more efficient debit card services to merchants.

53.    The NSR harms the competitive process and thereby harms consumers.

54.    Visa's intentional monopolization of the debit card services market harms the competitive process and thereby harms consumers.

55.    There exists no procompetitive justification for the NSR.

56.    As a direct and foreseeable result of defendant Visa USA's willful maintenance of its monopoly power in the debit card services market by the anticompetitive device of the NSR, plaintiffs have been injured in an amount to be determined at trial, but not less than an amount equal to (i) the

Debit Card Rate Differential, multiplied by (ii) the plaintiffs' total charge volume on Visa debit cards during the Damages Period.

## THIRD CLAIM FOR RELIEF
(For Violation of Section 1 of The Sherman Act)

57.  Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

58.  Defendant Visa has and exercises market power in the general purpose credit card services market and in the debit card services market.

59.  The NSR, imposed upon merchant plaintiffs by Visa through acquirer banks, represents an unlawful contract in restraint of trade.  Among other things, the NSR represents a vertical restraint that has the clear effect of restraining *inter*brand (i.e., horizontal) competition in the markets for credit card and debit card services.

60.  The NSR is anticompetitive.  Among its anticompetitive effects are the inflationary pressure it exerts on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of defendants' high cost payment media, the entrenchment of Visa's market position and the insulation of Visa from any competitive threat from a rival offering cheaper or more efficient credit or debit card services.

19

61.     There exists no procompetitive justification for the NSR.

62.     As a direct and foreseeable result of defendant Visa USA's willful imposition of the NSR, plaintiffs have been injured in an amount to be determined at trial.

WHEREFORE, plaintiff respectfully seeks an Order:

A.      Directing that the instant action may be maintained as a Class Action, on behalf of the Class defined above;

B.      Declaring that the No Surcharge Rule, as maintained by defendant Visa, is illegal to the extent it precludes members of the Class from passing along a surcharge, at a disclosed rate, in the approximate amount of the actual discount fee applicable to the particular transaction at hand;

C.      Awarding damages in an amount to be proven at trial;

D.      Awarding attorneys' fees and costs of suit; and

E.    Granting such other and further relief as this Court may deem

just and proper.

Dated:  this 6th day of May 2005.

CHITWOOD HARLEY HARNES LLP

By:  Martin D. Chitwood
GA Bar No. :  124950
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel: (404) 873-3900
Fax: (404) 876-4476
mdc@chitwoodlaw.com

Gary B. Friedman, Esq.
Noah Shube, Esq.
FRIEDMAN & SHUBE
155 Spring Street
New York, New York
Tel: (212) 680-5150
Fax: (212) 219-6446

Mark Reinhardt, Esq.
Mark A. Wendorf, Esq.
REINHARDT WENDORF &
BLANCHFIELD
1250 East First National Bank
Building
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100
(651) 287-2103